## THEODORE R. THOMPSON, Respondent, v. NATIONAL BANK OF COMMERCE et al., Appellants.

**Kansas City Court of Appeals, November 21, 1910.**

1. **CONTRACTS: Meeting of Minds: Secret Intention.** Notwithstanding that to make a valid contract the minds of the parties must meet and there must be an agreement to the same thing in the same sense, yet if the terms of the contract show a meeting of the minds and an agreement, no secret intention or understanding of either party can affect it.

2. ———: ———: ———: T says that he went to a broker's office in Kansas City, Mo., and asked him at what price he could sell them 30 shares of ice stock. That the brokers telegraphed to their correspondent in New York to ascertain what the stock could be sold for. The correspondent answered a certain price which was about five times the value of the stock. The brokers asked T if he would sell for that price and he said he would and that he did then sell to them. The brokers then telegraphed to sell and the sale was made; whereupon they gave T their check for the price, less their commission. The brokers then discovered that the name of the stock had been taken for that of a higher priced stock of similar name and the sale had been of that stock. They immediately notified T and tendered the stock he delivered them, and demanded the check and ordered payment stopped. T refused and brought suit on the check. *Held*, that if the brokers understood they were acting as T's agents and were to sell the stock for him, then there was no meeting of minds and no contract, and that plaintiff should not recover.

Appeal from Jackson Circuit Court.—*Hon. James E. Goodrich*, Judge.

REVERSED AND REMANDED.

*Johnson & Lucas* for appellants.

(1) Instruction number 2 given at request of plaintiff, was erroneous, in that, although it purported to cover all the issues in the case, it ignored the defense of defendants. 2 Thompson on Trials, section

2328. This defect was not cured by instruction number 1 given at the request of defendants. Russell v. Poor, 133 Mo. App. 723. (2) Instruction number 2 asked by defendants should have been given, because the testimony for both plaintiff and defendants showed that the minds of the parties did not meet in the transaction, and defendants have offered to place plaintiff *in statu quo*. Norton v. Bohart, 105 Mo. 615; Mingus v. Bank, 136 Mo. App. 407; Miller v. Brick Co., 139 Mo. App. 25. (3) Plaintiff ought not to be permitted to retain that which does not belong to him, and which he obtained by mistake, not for value, and he has no equitable claim thereto. Koontz v. Bank, 51 Mo. 275; Wood v. Kansas City, 162 Mo. 303.

*Seebree, Conrad & Wendorff* for respondent.

(1) The issue. Thompson v. Bank, 132 Mo. App. 225. (2) Instruction number 2 given for plaintiff was proper. Thompson v. Bank, 132 Mo. App. 225; Lange v. Railroad, 208 Mo. 458; Sizer Forge Co. v. Gas & Gasoline Engine Co., 135 Mo. App. 86. (3) Defendants' instruction number 2 was rightfully refused. There was no basis therefor under the pleadings. It had no place in the case, in view of the evidence. Embry v. Dry Goods Co., 127 Mo. App. 383. (4) The verdict of the jury is for the right party. R. S. of Mo. 1899, sec. 801; Kreis v. Railroad, 131 Mo. 533; Vermillion v. Parsons, 98 Mo. App. 72; Watson v. Printing Co., 56 Mo. App. 145; Reynolds v. Beck, 108 Mo. App. 188; 26 Am. and Eng. Ency. of Law (2 Ed.) 858.

ELLISON, J.—This action is based on a check given to plaintiff by Houston, Fible & Co., and drawn on the defendant bank. The action was originally against the bank alone, but afterwards Houston, Fible & Co., were, on their own motion, made parties defendant. The judgment was for plaintiff in the trial court.

This case was before us on a former appeal and will be found reported in 132 Mo. App. 225. At the first trial plaintiff had made an important issue in the case whether defendants Houston, Fible & Co., had been diligent, that is to say, whether they could have avoided the mistake by due diligence in the transaction. We rejected that idea and remanded the case for another trial.

By reference to the former report of the case it will be seen that plaintiff claims to have gone into defendant, Houston, Fible & Co.'s place of business and sold thirty shares of common stock of the American Ice Company for thirty-four dollars and twenty-five cents per share, receiving the check in payment, while defendants claim that they, as his brokers, merely sold the stock for him in New York through their correspondent in that city through whom they transacted business, and that in doing so the name of the American Ice Company became confused with that of the American Sureties Ice Co., and the latter stock was in the mind of the correspondent in New York, and it was the latter which they sold. That the latter stock was worth and sold for about five times the value of the former, and thereby defendants were led into the mistake of accounting to plaintiff and paying him a large sum of money to which he was not entitled.

Whatever may have been the understanding of plaintiff, the evidence establishes beyond any doubt whatever that by misunderstanding or mistake of defendants he obtained a check for about five times the value of his stock and that he is now endeavoring to get that amount of money, and it also undoubtedly establishes that defendants, in point of fact, did not intend to buy the stock of plaintiff, but to sell it for him through their correspondent in New York. In the first place we have their version of the conversation which took place between them and plaintiff at the beginning, and then we have the undisputed telegrams which

passed between them and their correspondent, which show that they asked the correspondent this question: "At what can you sell for us thirty shares American Ice common? Answer quick." The answer was that they could sell at from "thirty-four to thirty-four and three-fourths" dollars per share. They then, in a few moments, received another telegram from their correspondent that "thirty-four and a quarter (dollars) is bid for" the stock. They immediately telegraphed back to sell at that price and in a few moments received a telegram that the sale had been made. Plaintiff himself testified that he saw the first telegram asking "at what can you sell (the stock) for us." And that after exchanging telegrams with New York defendants asked him if he "would accept thirty-four and a quarter for the stock," and that he answered that "that was all right." There is no room for doubt that this question was asked plaintiff just after defendants received the above telegram that their correspondent had a bid for the stock at that price, and that they then, immediately upon getting plaintiff's acceptance, telegraphed to sell and the sale was made. We attach no importance to the words "for us" in defendants' first telegram, as the sale would have been made for them by their correspondent though they were agents.

If we assume that plaintiff was a man of ordinary sense he should have known that defendants sold the stock for him, and that they did not buy it from him. For he testified that he was in the defendants' office while at least a part of this telegraphic correspondence was going on and that he saw the first telegram. He further stated that he knew the check was drawn for less than the price of the stock by four dollars and thirty-five cents. But he said that defendants explained "that three dollars and seventy-five cents was commission which they had to pay the New York Stock

Exchange to execute that transaction, and sixty cents was to pay state taxes, and two cents a share went to the State of New York." He says that they said "those were the legal requirements as to what they would have to charge me." It is certainly difficult to understand how plaintiff could have supposed that he should pay a commission on the sale of stock in New York, which, if he had already sold to defendants, he did not own, or how any "charge" could be made against him; or what concern he had with New York when he had sold his stock to defendants in Kansas City at a fixed price. He stated by way of explanation of his conduct that "the trade was closed" and the check was drawn, when he discovered it was four dollars and thirty-five cents short and he let it go.

But, notwithstanding what defendants may have done or understood, it is a part of plaintiff's theory that they in terms bought the stock from him for themselves and therefore that no secret understanding of theirs could be allowed to overcome the plain terms of a contract. [Embry v. Dry Goods Co., 127 Mo. App. 383.] Granting this as a proposition of law, does it apply to the evidence in the case? We think it does not from the fact that, in our opinion, the evidence does not show a contract expressed in such plain words or terms as not reasonably to permit two different understandings. It was on the theory of its not being understood by defendants as now claimed by plaintiff, that they offered an instruction, which the court refused, informing the jury that in order to make a valid contract it was necessary that the minds of the parties should meet and that if one party thought he was selling to the defendants, and the other thought they were selling for the plaintiff, there was no contract. We think the testimony of plaintiff, coupled with conceded facts, was sufficient to demand the giving of the instruction. Defendants' business was that of brokers, that is to

say, agency for others, and not the transactions for themselves.

We do not mean to be understood as saying that brokers may not act for themselves in a given transaction, but defendants were engaged in a business which was that of acting for others. It was natural for them to understand, as they probably did understand even from the standpoint of the testimony for plaintiff in its entirety, that they were only acting as his agents. The language used as given by plaintiff and his conduct in connection therewith, did not make it unreasonable for defendants to understand they were acting as agents for him.

The judgment is reversed and the cause remanded. All concur.